U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described**.

**Signed November 27, 2006**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **THE HERITAGE ORGANIZATION, L.L.C.,** | § | **CASE NO. 04-35574-BJH-11** |
| | § | |
| **Debtor.** | § | |
| | § | |
| **DENNIS FAULKNER, TRUSTEE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **- against -** | § | **ADV. PRO. NO. 05-3671-BJH** |
| | § | |
| **MIKRON INDUSTRIES, INC.,** | § | |
| | § | |
| **Defendant.** | § | |

### MEMORANDUM OPINION AND ORDER

Before the Court are two motions for summary judgment. Plaintiff Dennis S. Faulkner, the Chapter 11 trustee of the estate of The Heritage Organization, L.L.C. ("Heritage"), has filed his motion for partial summary judgment (the "Trustee's Motion") and Defendant Mikron Industries, Inc. ("Mikron") has filed its cross-motion for summary

judgment ("Mikron's Motion") (the Trustee's Motion and Mikron's Motion shall be collectively referred to as the "Motions"). The Court heard oral argument on the Motions on August 28, 2006. At the conclusion of the hearing, the Court asked both parties to file supplemental briefs addressing certain issues that arose during the hearing. The last of those briefs was filed on September 15, 2006, at which time the Court took the Motions under advisement.[1]

The Court has core jurisdiction over this action and the Motions in accordance with 28 U.S.C. §§ 1334 and 157(b). This Memorandum Opinion and Order contains the Court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Heritage is a Delaware limited liability company that was formed on or about December 28, 1994. Prior to Heritage's bankruptcy filing, Heritage provided various wealth, estate, and tax planning strategies to extremely high net-worth individuals for a fee.[2]

Mikron is a Washington corporation that manufactures vinyl window components.[3] Mikron was founded by W. Ronald Sandwith ("Ron Sandwith") and, as of November 2002, was a closely-held family company.[4]

Ron Sandwith was a successful businessman who amassed wealth during his lifetime.[5] In 2002, Ron Sandwith desired to engage in estate planning activities.[6] On

---

[1] The Court notes, however, that one of the parties' appendices of summary judgment evidence, although referred to in the briefs, was inadvertently not filed with the Court until November 2, 2006.

[2] App. to Trustee's Mot. For Partial Summ. J., (hereinafter "T. App.") Exh. G, ¶ 5 (App. 110).

[3] See T. App., Exh. A, ¶¶ 7, 10 (App. 2-3); T. App., Exh. B, ¶¶ 7, 10 (App. 15).

[4] T. App., Exh. B, ¶ 10 (App. 15). Although not directly relevant here, the Sandwith Children sold Mikron in 2004.

[5] Id.

November 7, 2002, Ron Sandwith entered into an agreement with Heritage to obtain access to Heritage's estate planning strategies (the "Agreement").[7] A true and correct copy of the Agreement is Exhibit C to the Appendix to the Trustee's Motion for Partial Summary Judgment ("Trustee's Appendix").[8] On the same date, the adult children of Ron Sandwith (Jeffrey Sandwith, David Sandwith, Mark Sandwith and Susan Crader, collectively referred to herein as the "Sandwith Children") entered into virtually identical agreements, true and correct copies of which are collectively assembled as Exhibit D to the Trustee's Appendix (the "Children's Agreements" and, together with the Agreement, are collectively referred to as the "Agreements").[9]

Pursuant to the Agreements, Heritage agreed to communicate certain estate planning strategies to Ron Sandwith and the Sandwith Children (the "Strategies").[10] Neither Ron Sandwith nor the Sandwith Children (collectively, the "Sandwiths") had an obligation to use any of the Strategies presented.[11] If the Sandwiths decided to utilize the Strategies, however, they were obligated to pay a fee to Heritage under the Agreements (the "Utilization Fee").[12]

---

[6] T. App., Exh. B, ¶ 11 (App. 15).

[7] *Id.*

[8] *See* T. App., Exh. G, ¶ 7 (App. 111).

[9] *See id.*, ¶ 8 (App. 111).

[10] *See* T. App., Exh. C, art. I (App. 21); T. App., Exh. D., art I (App. 36, 52, 68, 84); *see also* T. App., Exh. B, ¶ 11 (App. 15).

[11] T. App., Exh. C, art. II (App. 21); T. App., Exh. D, art. II (App. 36, 52, 68, 84).

[12] T. App., Exh. C, art. 4.1 (App. 21-22); T. App., Exh. D, art. 4.1 (App. 36-37, 52-53, 68-69, 84-85). The Sandwith Children are jointly and severally liable for the Utilization Fee under the terms of the Children's Agreements because the Utilization Fee is based upon utilization irrespective of whose property is used in the implementation. *See* T. App., Exh. D, art. 4.1 (App. 36-37, 52-53, 68-69, 84-85) (requiring payment pursuant to article 4.2 based upon the Property used in the implementation); *id.*, art. I (App. 36, 52, 68, 84) ("Property" defined as "any and all kinds of property, *whether or not the property is owned by or Controlled by the Principals…*") (emphasis added). Indeed, according to the Sandwith Children, they in fact paid a portion of first half of the Utilization Fee, as evidenced by their proofs of claim in the main bankruptcy case pursuant to which they seek a partial refund of the amounts they paid. *See* T. App., Exh. E (App. 100-103); *see also* T. App., Exh. I, ¶ 6 (App. 115).

Heritage communicated the Strategies to the Sandwiths.[13] Under the terms of the Agreements, one-half of the Utilization Fee was due and payable within five (5) days after the Sandwiths informed Heritage that they wished to utilize the Strategies.[14] In December 2002, the Sandwiths elected to utilize the Strategies.[15] And, on January 15, 2003, $6 million of the Utilization Fee was paid by the Sandwiths through Mikron.[16]

The balance of the Utilization Fee, per the Agreements, was due and payable by no later than ten (10) days after utilization of the Strategies.[17] The Sandwiths retained the law firm of Lewis, Rice & Fingersh to prepare the legal documents required to implement the Strategies and to provide a legal opinion as to the effectiveness of the Strategies.[18] The implementation process commenced in December 2002.[19] Accordingly, the balance of the Utilization Fee was due shortly thereafter.

The Sandwiths did not make the additional payment. Instead, in February 2003, Ron Sandwith and Mikron executed that certain Promissory Note dated as of January 2, 2003 in the principal amount of $5,386,919.00 (the "Note"). A true and correct copy of the Note is Exhibit F to the Trustee's Appendix.[20] Mikron's board of directors authorized its execution of the Note.[21]

---

[13] T. App., Exh. B, ¶ 11 (App. 15).
[14] T. App., Exh. C, art. 4.5 (App. 22); T. App., Exh. D, art. 4.5 (App. 37, 53, 69, 85).
[15] T. App., Exh. B, ¶ 14 (App. 16).
[16] *See id.* Mikron declared a dividend to its shareholders – *i.e.*, Ron Sandwith (approximately 93%) and the Sandwith Children (approximately 7%), who in turn assigned the dividend to Heritage. *See* App. to Mikron's Cross Mot. For Summ. J. and Opp. To the Trustee's Mot. For Partial Summ. J. (hereinafter, "Mikron App."), Exh. A, ¶ 6 (App. 7).
[17] T. App., Exh. C, art. 4.5 (App. 22); T. App., Exh. D, art. 4.5 (App. 37, 53, 69, 85).
[18] *See* T. App., Exh. A, ¶ 15 (App. 4); T. App., Exh. B, ¶ 15 (App. 16).
[19] *See T.* App., Exh. A, ¶ 15 (App. 4-5); T. App., Exh. B, ¶ 15 (App. 16).
[20] *See* T. App., Exh. G, ¶ 9 (App. 111); *see also* T. App., Exh. A, ¶ 17 & Exh. F (App. 5, 104-108); T. App., Exh. B, ¶ 17 (App. 16).
[21] *See* T. App., Exh. A, ¶ 17 (App. 5); T. App., Exh. B, ¶ 17 (App. 16).

Ron Sandwith died on May 27, 2003.[22]  In accordance with its terms, the Note matured 30 days after Ron Sandwith's death.  Accordingly, on June 26, 2003, the Note matured.[23]  Notwithstanding the Note's maturity and a demand for payment, Mikron failed to pay the Note.[24]

On October 6, 2005, the Trustee brought this suit against Mikron to collect the Note.  On November 7, 2005, Mikron answered the Trustee's complaint, asserting numerous defenses to the collection of the Note.  As of December 5, 2005, unpaid principal and interest under the Note totaled $7,979,707.30, with interest continuing to accrue at the rate of approximately $2,732.98 per day.[25]  Thereafter, the Motions were filed.

## II.    LEGAL ANALYSIS

### A.    Applicable Legal Standard

Rule 56 of the Federal Rules of Civil Procedure, as incorporated into Rule 7056 of the Federal Rules of Bankruptcy Procedure, controls the disposition of the Motions. Pursuant to Rule 56, "[s]ummary judgment is proper when the pleadings and evidence demonstrate that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *DIRECTTV, Inc. v. Budden*, 420 F.3d 521, 529 (5th Cir. 2005) (quoting *Pluet v. Frasier*, 355 F.3d 381, 383 (5th Cir. 2004)); *see* Fed. R. Civ. P. 56(c) ("The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

---

[22]  T. App., Exh. A, ¶ 19 (App. 5); T. App., Exh. B, ¶ 19 (App. 17).
[23]  *See* T. App., Exh. F, ¶ 2 (App. 104).
[24]  T. App., Exh. B, ¶ 20 (App. 17).
[25]  T. App., Exh. H, ¶ 4 (App. 113).

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.").

The moving party has the initial burden of showing that there is no genuine issue of material fact. Once that burden is met, then the nonmoving party must produce evidence or designate specific facts showing the existence of a genuine issue for trial. *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 507 (5th Cir. 2003); *Allen v. Rapides Parish Sch. Bd.*, 204 F.3d 619, 621 (5th Cir. 2000). To defeat a summary judgment motion, the non-movant must "adduce evidence which creates a material fact issue concerning each of the essential elements of its case for which it will bear the burden of proof at trial." *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619 (5th Cir. 1993). The non-moving party must "'do more than simply show some 'metaphysical doubt as to the material facts.'" *Epps v. NCNB Texas Nat'l Bank,* 838 F. Supp. 296, 299 (N.D. Tex.), *aff'd* 7 F.3d 44 (5th Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "'[O]n summary judgment the inferences to be drawn from the underlying facts contained in (the moving party's) materials must be viewed in the light most favorable to the party opposing the motion.'" *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

### B. Mikron's Motion

The Court will address Mikron's Motion first, because if it is granted, the Court will have concluded that the Note is unenforceable and that Mikron is entitled to a judgment in its favor, thereby mooting the Trustee's Motion and any further action in connection with this suit. For the reasons explained more fully below, the Court

concludes: (i) the Note's "waiver of defenses" clause does not prelude the Court from considering whether the Note itself is unenforceable; (ii) Mikron has not waived its ability to assert this "defense" by its failure to plead it in its answer; (iii) to the extent the "defense" should have been pled in Mikron's answer, there is no substantial reason to deny Mikron leave to amend; (iv) there is a disputed fact question as to whether Mikron has standing to assert this "defense" as an accommodation party; and (v) the disputed fact question is not material, however, because even if Mikron has standing to assert the "defense," it fails on the merits.

In its motion, Mikron contends that the parties' contract consists of the Note that Ron Sandwith and Mikron signed, together with the five Agreements Heritage signed with Ron Sandwith and the Sandwith Children. In short, Mikron contends that the Note is legally unenforceable against it because the Note is an unenforceable attempt to amend the Agreements. For the reasons explained more fully below, the Court disagrees.

The premise of Mikron's argument is that Ron Sandwith could not amend his Agreement with Heritage without the consent of each of his four adult children, who also signed service agreements with Heritage – *i.e.*, the Children's Agreements. According to Mikron, "Ron Sandwith, on his own, could not agree with Heritage to ignore the pending appraisal of his Mikron shares and liquidate the amount of the fee that all of the Sandwith Claimants together owed." Mikron's Corrected Mem. of Law in Supp. of Cross Mot. for Summ. J. (Docket No. 40), p. 10. Therefore, according to Mikron, the Note is an impermissible attempt to amend the Agreements without the Sandwith Children's consent, and it is unenforceable against Mikron.

As an initial matter, the Trustee contends that Mikron is barred from asserting what he characterizes as the "subsequent invalid amendment defense." First, the Trustee contends that Mikron waived this, and any other, defense when it executed the Note. In support of his argument the Trustee relies on paragraphs 14 and 19 of the Note, which provide as follows:

> 14.     The Co-Makers … of this Note state and warrant that this Note is good, valid, and in all respects free from all defenses, both in law and in equity, and that any Person relying on said instruments [sic] or otherwise acquiring any interest therein [sic] may do so in reliance upon the truth of the matters herein recited.
> . . .
>
> 19.     The Co-Makers state and warrant that this Note is good, valid, and in all respects free from all defenses, both in law and in equity, and that any person relying on said instruments [sic] or otherwise acquiring any interest therein [sic] may do so in reliance upon the truth of the matters stated herein.[26]

In response to the Trustee's waiver argument, Mikron contends that because the Note is unenforceable, any waivers contained in the Note are equally unenforceable. Specifically, Mikron contends that

> "[a] warranty in a contract that was never formed cannot preclude the conclusion that the contract was never formed. No warranty can contract away enforcement of the law of contract formation. . . . Heritage needed five signatures on this Note or an allonge to the Note, whether by indorsement or consent, to validly amend the payment terms of the Agreements. Because Heritage did not obtain the consent of all affected parties, the Note never existed as an enforceable contract."

Mikron's Reply to the Trustee's Mem. of Law in Opp. to Mikron's Cross Mot. for Summ. J. (Docket No. 38), p. 3.

While the Court will address the Note's waiver provision in more detail later in this Memorandum Opinion and Order, the Court agrees with Mikron that a waiver

---

[26]  T. App., Exh. F, ¶¶ 14, 19 (App. 107).

contained in the Note cannot preclude the Court's consideration of the enforceability of the Note as a whole. In short, if the Note is unenforceable, then so is the waiver contained in that Note.

Next, the Trustee contends that Mikron waived this defense by not specifically pleading it as an affirmative defense in its answer to the Trustee's complaint. While Mikron disputes that it needed to specifically plead this defense in its answer, it seeks leave to amend if the Court disagrees. *See* Mikron's Reply to the Trustee's Mem. of Law in Opp. to Mikron's Cross Mot. for Summ. J. (Docket No. 38), p. 4.[27]

A motion for leave to amend is normally judged under Rule 15(a) of the Federal Rules of Civil Procedure, which provides that leave to amend shall be freely given when justice so requires. However, the Fifth Circuit has held that the standards of Fed. R. Civ. P. 16(b) will apply when leave to amend would require the modification of a scheduling order. *S&W Enterprises, L.L.C. v. SouthTrust Bank of Alabama, N.A.*, 315 F.3d 533 (5th

---

[27] The Court agrees with Mikron that in this context, its allegations do not constitute an affirmative defense which must be affirmatively pled or they are waived. The Trustee characterizes Mikron's allegations and arguments as being in the nature of a "modification" defense. However, each of the cases the Trustee cites involves a factual context in which a defendant was seeking to avoid liability on an original, underlying contract by alleging that it had been modified by a later agreement. In this case, however, Mikron is not alleging a modification in order to avoid liability on the original, underlying contract. Rather, Mikron is arguing that the alleged modification is unenforceable because it was not signed by all parties to the underlying contract. Moreover, even if its allegations do constitute an affirmative defense, the Court does not believe that its defense has been waived under Rule 8(c) by a failure to plead the defense in its answer. Failure to comply precisely with Rule 8(c) by raising an affirmative defense belatedly is not fatal where it does not result in unfair surprise. *Phyfer v. San Gabriel Dev. Corp.*, 884 F.2d 235 (5th Cir. 1989). If a defendant raises an issue "at 'a pragmatically sufficient time,' and if the plaintiff is not prejudiced in its ability to respond, there is no waiver" of an affirmative defense not pled under Rule 8(c). *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 271 (5th Cir. 1999); *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 562 (5th Cir. 1998). Mikron argues that the Trustee has not been prejudiced, and submits the declaration of John C. Bjorkman, one of Mikron's attorneys in support of that argument. The Bjorkman declaration states that shortly after the Trustee filed his complaint, Bjorkman informed the Trustee that since the Agreement provides that all parties must sign amendments, and the Note is not signed by the Sandwith Children, the Note could not be an amendment to the Agreement. *See* Mikron's Supp. To App. To Mikron's Cross Mot. For Summ. J., Exh. E, ¶ 5 (App. 330). This statement, however, is not competent summary judgment evidence, as it is hearsay. However, the Court notes that the Trustee has not alleged, much less established, that he has been prejudiced in his ability to respond to the late assertion of the alleged defense.

Cir. 2003). Although a scheduling order was entered in this adversary proceeding and was later modified by stipulation of the parties, neither the original scheduling order nor the stipulation modifying it contain a deadline for the filing of amended pleadings. Thus, the Court concludes that leave to amend here would *not* require modification of a scheduling order. Accordingly, consideration of the motion for leave to amend is governed by the more liberal standard of Fed. R. Civ. P. 15(a).

To deny leave to amend under Rule 15(a), there must be a substantial reason to do so. *Siemens Med. Solutions, USA, Inc. v. Sunrise Med. Tech., Inc.*, No. 3:04-CV-2711-H, 2005 WL 615747 (N.D. Tex. Mar. 16, 2005) (unreported decision). Determining whether a substantial reason to deny leave to amend exists requires an analysis of five factors: (1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by previous amendments, (4) undue prejudice to the opposing party, and (5) futility of the amendment. *Id.* at *1. In this case, the Trustee has not argued, let alone shown, that any of these factors should preclude amendment. Therefore, to the extent Mikron's "affirmative defense" should have been specifically pled, the Court will grant Mikron's request for leave to amend because there is no prejudice to the Trustee from the Court's consideration of this defense on the merits.

As a final predicate matter, the Trustee contends that Mikron lacks standing to assert the so-called subsequent invalid amendment defense because Mikron is neither a party to the Agreements nor an intended third-party beneficiary of the Agreements. While the Court agrees with the Trustee in part – *i.e.*, Mikron is not a party to the Agreements or a third-party beneficiary of the Agreements, and cannot assert this defense in either such capacities, Mikron may be able to assert this defense in accordance with

Section 3-305(d) of Texas's version of the Uniform Commercial Code ("UCC"), which provides that:

> (d) In an action to enforce the obligation of an accommodation party to pay an instrument, the accommodation party may assert against the person entitled to enforce the instrument any defense or claim in recoupment under Subsection (a) that the accommodated party could assert against the person entitled to enforce the instrument, except the defenses of discharge in insolvency proceedings, infancy, and lack of legal capacity.

Tex. Bus. & Com. Code Ann. § 3.305(d) (Vernon 2002 & Supp. 2006). Under the UCC, an accommodation party is one who "signs the instrument for the purpose of incurring liability on the instrument without being a direct beneficiary of the value given for the instrument." Tex. Bus. & Com. Code Ann. § 3.419(a) (Vernon 2002 & Supp. 2006).[28] Mikron argues that it was not a direct beneficiary of Heritage's estate planning services – *i.e.*, the services provided under the Agreements. However, Section 3.419 speaks to the value *given for the instrument – i.e.*, the Note, and thus Mikron's argument about not being a beneficiary of Heritage's estate planning services under the Agreements is irrelevant. The relevant inquiry is whether Mikron was a beneficiary of the value given for the Note, to which we now turn.

Comment 3 to UCC § 3.419 states that "whether a person is an accommodation party is a question of fact." The burden of proving accommodation party status is on the party asserting the status. *FDIC v. Blanton*, 918 F.2d 524 (5th Cir. 1990) (applying Texas law); *Crimmins v. Lowry*, 691 S.W.2d 582, 586 (Tex. 1985) (Ray, concurring); *Darden v. Harrison*, 511 S.W.2d 925, 927 (Tex. 1974); *Bixenstine v. Palacios*, 805 S.W.2d 889, 892 (Tex. App. – Corpus Christi 1991). Texas courts look to two primary

---

[28] Section 3.419(a) provides that "[i]f an instrument is issued for value given for the benefit of a party to the instrument ("accommodated party") and another party to the instrument ("accommodation party") signs the instrument for the purpose of incurring liability on the instrument without being a direct beneficiary of the value given for the instrument, the instrument is signed by the accommodation party "for accommodation.""

factors in determining whether a party has signed for accommodation: (1) the intent of the parties to the instrument, and (2) whether the party claiming accommodation party status received a direct benefit from execution of the instrument. *Crimmins*, 691 S.W.2d at 586 (Ray, concurring); *FDIC v. F&A Equip. Leasing*, 854 S.W.2d 681 (Tex. App. -- Dallas 1993); *Dalton v. George B. Hatley Co.*, 634 S.W.2d 374 (Tex. App.-- Austin 1982); 9 Tex. Jur. 3d Bills & Notes § 101 (2006).

The Trustee disputes Mikron's claim of accommodation party status. The Trustee argues that the consideration for the Note was a two year-extension of the time due for payment of the balance of the Utilization Fee, and that Mirkon was a direct beneficiary of this consideration, thereby defeating Mikron's claim of accommodation party status. As relevant here, the question becomes – did Mikron raise a genuine issue of material fact regarding its accommodation party status? If it did, Mikron contends that this fact question precludes a determination of Mikron's status as an accommodation party, which in turn precludes a determination of its standing to assert the so-called subsequent invalid amendment defense.

The summary judgment record consists of the following evidence regarding Mikron's receipt of a benefit from the execution of the Note. First, Michael Kornman's deposition testimony that Mikron and the Sandwiths "wanted a promissory note because they needed to make - they had a very extensive capital expenditure budget for the upcoming year. They were concerned about having enough cash or enough funds - don't know – can't say which, specifically. And as an accommodation to the Sandwith family and Mikron, we took a promissory note for the remainder of the agreed-upon amount of

the fee."[29]  Second, Michael Kornman's deposition testimony that he was told that "there was a substantial amount of capital needed in the upcoming year, and that they couldn't – by – by paying the entire fee, it would – it would prohibit them – could prohibit them from doing what they needed to do to operate their business."[30]  And last, Jeffrey Sandwith's declaration, which states, in essence, that while Mikron had expansion plans in 2003, it did not need an extension of the payment terms for the second portion of the Utilization Fee in order to execute those plans, because Mikron had other, less expensive sources of funds available to it to carry out its expansion, and it in fact did so by using cash on hand. [31]

In light of the conflicting evidence regarding a direct benefit to Mikron from the execution of the Note, the Court concludes that there is a disputed issue of fact which precludes a determination of Mikron's status as an accommodation party and, therefore, its standing to assert a defense of the alleged accommodated party, Ron Sandwith, here – *i.e.*, that the Note is an impermissible modification of the Agreement.[32]

While the Court concludes that in this context, determining Mikron's status as an accommodation party requires a determination of a disputed issue of fact, the Court also concludes that the disputed issue of fact is not a *material* one.  That is, even assuming that Mikron has standing as an accommodation party to assert what the Trustee calls the "subsequent invalid amendment defense," the Court concludes, for the reasons explained more fully below, that Mikron's argument fails on the merits. It fails on the merits

---

[29] Mikron App., Exh. C-1 (App. 163).

[30] *Id*. at App. 164.

[31] Mikron App., Exh. A, ¶ 10 (App. 8-9).

[32] The Court notes that Mikron was not liable on the underlying Agreement for payment of the Utilization Fee.  However, any argument that it could therefore have received no benefit from an extension of the time due for payment (which has not been clearly made) would fail in the face of the undisputed evidence that Mikron was, in essence, the source of payment for the $6 million partial payment made to Heritage in January, 2003, and was going to be the source of payment for the balance of the Utilization Fee as well.

because: (i) the multiple Agreements, when construed together, evince the parties' intent that the Agreements could be modified by a writing signed by only the *affected party*; and (ii) the only party affected by the Note (which is what Mikron characterizes as the invalid amendment to the Agreements) was Ron Sandwith, and he signed the Note.

The Court will preface its further ruling with several observations. First, the Court agrees that the law in Texas is that contracts, executed at the same time and concerning the same subject matter, are read and construed together for the purpose of ascertaining the parties' intent. *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831 (Tex. 2000); *Jim Walter Homes, Inc. v. Schuenemann*, 668 S.W.2d 324 (Tex. 1984); *In re BP America Prod. Co.*, 97 S.W.3d 366 (Tex. App. – Houston [14 Dist.] 2003). The Agreements between the Sandwiths and Heritage are, however, oddly constructed. The Agreements appear, in most respects, to be identical, and at least the Children's Agreements (which are, in fact, identical) purport to define Ron Sandwith as a "Party," although, significantly, the reverse is not true – *i.e.*, the Sandwith Children are not defined as "Parties" to Ron Sandwith's Agreement.[33] It is clear that there is only one promise of performance under all five Agreements– *i.e.*, payment – due from all of the Sandwiths together,[34] and Heritage only provided one service to all of them – *i.e.*, estate planning services. But, instead of having Ron Sandwith and the Sandwith Children sign

---

[33] As an example, the service agreement with Jeffrey S. Sandwith and Linda K. Sandwith contains an opening recital which states: "In consideration of the mutual promises and covenants of each to the other, this Agreement . . . is entered into by and between The Heritage Organization, L.L.C. (referred to herein as the "Organization") and Mr. Jeffrey S. Sandwith and Mrs. Linda K. Sandwith (these Persons, together with their Affiliates [as defined herein], are collectively referred to herein as the "Principals"). The Organization and the Principals are sometimes referred to herein as a "Party," or, collectively, as "Parties"". The word "Affiliates" is elsewhere defined to include family members. *See* T. App., Exh. D, ¶ 10.2 (App. 41). Each of the Children's Agreements with Heritage contains this recital. But, Ron Sandwith's Agreement does not include "Affiliates" as either "Principals" or "Parties." Read literally, it appears that the parties intended for Ron Sandwith to be a "Party" to the Children's Agreements, but the Sandwith Children were *not* intended to be "Parties" to Ron Sandwith's Agreement.

[34] While the Children's Agreements describe their liability to Heritage as "joint and several," Ron Sandwith's Agreement describes his liability as "several."

one agreement, the parties chose to have each of the Sandwiths sign a separate agreement.

Mikron argues that all of the Agreements must be construed as one agreement. This argument, as far as it goes, makes sense and is in accord with Texas law. Mikron next argues, however, that the Agreements are one "agreement" for all purposes, such that the signature by only one of the Sandwiths on a purported modifcation is an invalid and unenforceable attempt to modify the "one agreement" to which the other Sandwiths were, in effect, "parties." Here, despite the rule in Texas that the Agreements will be construed together, the Court disagrees. As noted earlier, courts in Texas and elsewhere construe contracts together for the purpose of ascertaining the parties' intent. Here, the intent of the parties, as expressed in *each* of the five separate Agreements that were executed, is clear – Ron Sandwith was given the authority to modify his Agreement by a writing executed by him as the *affected party*.

Paragraph 11.4 of all five Agreements, entitled "Amendments and Supplemental Agreements" provides that each agreement "may be changed, terminated, amended or supplemented only by an agreement, in writing, fully executed (referred to herein as a "Supplemental Agreement") by all the Parties affected by the Supplemental Agreement and delivered in accordance with any express Terms hereof." [35] As noted previously, the Sandwith Children were not signatories to Ron Sandwith's Agreement and were not defined as "Parties" to the Agreement. Therefore, to the extent that only Ron Sandwith was a party affected by the Note, Ron Sandwith alone was permitted to modify his Agreement by executing the Note.[36]

---

[35] T. App., Exh. C, ¶ 11.4 (App. 28); T. App., Exh. D, ¶ 11.4 (App. 43, 59, 75, 91).
[36] The effect of the Note on the Sandwith Children is discussed *infra* at pp. 18-20.

Moreover, Ron Sandwith's Agreement with Heritage differs in another material respect from the Children's Agreements. Article IX in each of the Children's Agreements with Heritage provides that each is "jointly and severally liable for all payments due to the Organization under this Agreement," while Article IX of Ron Sandwith's Agreement provides that Ron Sandwith "shall be severally liable for all payments due to the Organization under this Agreement." Even construing all of the Agreements together under Texas law, the Court concludes that Heritage and Ron Sandwith intended for Ron Sandwith to be liable separately from the Sandwith Children, and it thus makes sense that he would be permitted to modify his Agreement with his signature alone, so long as he was the only "Party" affected by the modification.

Therefore, while it may be true that Ron Sandwith could not change the terms of the Children's Agreements with Heritage, neither his Agreement nor Texas law[37] precludes him from agreeing to liquidate the amount of the fee that he was liable for under his Agreement with Heritage, and then agreeing to pay it on different terms than those set forth in his Agreement. He did so by signing the Note, and by causing Mikron, his closely-held corporation, to sign the Note as a co-maker.[38] Moreover, nothing in Ron Sandwith's Agreement with Heritage requires his children to be a party to any further agreement that Ron Sandwith might enter into with Heritage. If the Sandwith Children wanted to limit their father's ability to enter into another agreement with Heritage without their consent, such a provision should have been included in Ron Sandwith's

---

[37] The Agreements are governed by Texas law. *See* T. App., Exh. C, art. 12.3 (App. 29); T. App., Exh. D, art. 12.3 (App. 44, 60, 76, 92).

[38] While Mikron makes much of the fact that the Sandwith Children did not agree to liquidate the amount owing to Heritage under the Children's Agreements, the Court finds that at least one of the Sandwith Children, Jeffery Sandwith, was aware of what his father, Ron Sandwith, was doing and apparently voiced no objection because Jeffery signed the Note on behalf of Mikron as its President.

Agreement or a single service agreement should have been entered into among Heritage, Ron Sandwith, and the Sandwith Children.

As noted earlier, Section 11.4 of the Agreement provides that it may be "changed, terminated, amended or supplemented only by an agreement, in writing, fully executed . . . by all the Parties affected by the Supplemental Agreement. . . ."[39] As Mikron notes, "[i]n relevant part, this clause incorporates hornbook law that parties may only modify a contract if all of the required formalities of contract formation are met: a meeting of the minds and consideration."  Mikron's Mem. of Law in Supp. of Cross Mot. for Summ. J. (Docket No. 40), p. 8 (citation omitted).  However, contrary to Mikron's further argument, the Sandwith Children were not parties to Ron Sandwith's Agreement with Heritage.  The only party to Ron Sandwith's Agreement that was affected by the Note was Ron Sandwith, and he signed it.  Ron Sandwith clearly reached a meeting of the minds with Heritage regarding the execution of the Note.  And, the Note, which recites that it was given "for value received," is clearly supported by consideration.[40]

Moreover, under Texas law, a party to an agreement may enter into a subsequent agreement concerning the subject matter of the first agreement.  *Fish v. Tandy Corp.*, 948 S.W.2d 886 (Tex. App. – Fort Worth 1997).  While the two agreements will be considered together, Texas law provides that to the extent the agreements conflict, the terms of the subsequent agreement will control.[41]  *Saturn Capital Corp. v. Dorsey*, No.

---

[39] T. App., Exh. C, art. 11.4 (App. 28).
[40]  T. App., Exh. F (App. 104); *see also* Tex. Bus. & Com. Code Ann. § 3.303(a)(3), (b) (Vernon 1998 & Supp. 2006) (a note is issued "for value" if it is issued as payment of an antecedent claim against any person, whether or not the claim is due, and "consideration" means "any consideration sufficient to support a simple contract;" if the note is issued for value, it is supported by consideration).
[41] In defending against the enforceability of the Note (as opposed to seeking an affirmative judgment in its favor through Mikron's Motion), Mikron argues that the Trustee's "story [about why Ron Sandwith agreed to liquidate the amount of the Utilization Fee in the Note] is not worthy of belief."  *See* Mikron's Corrected Mem. of Law in Opp. to Trustee's Mot. for Summ. J. (Docket No. 41), p. 5.  While an interesting

01-04-00626-CV, 2006 WL 1767602 (Tex. App. – Houston [1st Dist.] June 29, 2006) (unreported decision); *McPherson v. Longview United Pentecostal Church, Inc.*, 540 S.W.2d 424 (Tex. App. – Tyler 1976). While Mikron argues that all five of the Agreements and the Note constitute a single agreement here, nothing in the Agreements or the Note requires that conclusion. Again, if the Sandwith Children wanted to limit their father's ability to enter into a further agreement with Heritage, they should have insisted that a single service agreement with Heritage be signed by all of them, instead of each of them signing his/her own service agreement.

Moreover, while Mikron argues about "potentially inconsistent obligations"[42] resulting from construing the Agreements and the Note separately, *see* Mikron's Corrected Mem. Of Law in Supp. Of Cross Mot. For Summ. J. (Docket No. 40) at p. 10, the Court is not persuaded that this "potential" presents a legal impediment to Ron Sandwith's decision to liquidate the Utilization Fee due under his Agreement with Heritage by signing the Note, or the enforcement of the Note against Mikron as co-maker. As relevant to this dispute, the only obligation the Sandwith Children owed to Heritage under the Children's Agreements was to pay the Utilization Fee due to Heritage for the use of the Strategies. Each of the Sandwith Children was jointly and severally liable for the Utilization Fee.[43] However, when Ron Sandwith and Mikron paid any

---

argument, it is irrelevant to the legal issue of the Note's enforceability against Mikron – *i.e.*, the Court does not need to understand why Ron Sandwith and Mikron decided to sign the Note. The simple and relevant fact is that they signed the Note, which is clear and unambiguous in its terms. *See infra* at pp. 23-25.

[42] According to Mikron, the Sandwith Children might be liable for a lesser fee under the terms of the Children's Agreements than Ron Sandwith and Mikron agreed to pay by executing the Note. Specifically, Mikron notes that the Sandwith Children have filed proofs of claim in the main bankruptcy case seeking a partial refund of their pro rata share of the initial cash payment made to Heritage on January 15, 2003. According to Mikron, the Sandwith Children contend that the appraisal process and fee calculation contemplated under each of the Agreements resulted in the Utilization Fee being less than the initial cash payment, thereby entitling them to a partial refund of monies already paid.

[43] T. App., Exh. D, art. 9 (App. 40, 56, 72, 88).

remaining portion of the Utilization Fee due to Heritage by executing the Note, the Sandwith Children's remaining obligation to pay the Utilization Fee was satisfied. *See Restatement (Second) of Contracts* § 293 (1981) ("full or partial performance or other satisfaction of the contractual duty of a promisor, discharges the duty to the obligee of each other promisor of the same performance[44] to the extent of the amount or value applied to the discharge of the duty of the promisor who renders it"). If the Sandwith Children are correct in their interpretation of the underlying Agreements, then Mikron will have paid Heritage arguably more than the Sandwith Children owed under the Children's Agreements, and Heritage would have no further claims against them for payment of the Utilization Fee.

In addition, as the Sandwith Children were not parties to the Note (which Mikron argues impermissibly amended the Children's Agreements with Heritage), the Sandwith Children are not bound by Ron Sandwith's liquidation of the Utilization Fee in the Note, and they are free to continue to seek a refund of any alleged overpayment they made to Heritage. If the Note is finally paid by Mikron, the Trustee would have no reason to, and could not, seek further payment from the Sandwith Children. Nor is the Court aware of any basis upon which Mikron, having paid its own liability as co-maker of the Note, could seek to collect from the Sandwith Children their pro rata share of the Utilization Fee thus paid by Mikron. There is no contract between Mikron and the Sandwith Children (at least none has been alleged) by which the Sandwith Children would be

---

[44] As noted earlier, the Agreements here are oddly structured, in that there are five separate Agreements. However, when construed together, the Agreements manifest only one promise of performance from the Sandwiths – *i.e.*, payment. When two or more parties to a contract make a promise or promises to the same promisee, a promise by two or more promisors is a promise that the same performance shall be given, unless a contrary intention is manifested. *See Restatement (Second) of Contracts* § 288 (1981).

obligated to repay Mikron for its payment on the Note.  Moreover, common law principles of contribution are inapplicable on these facts.  "The right to contribution is the right of a person who has discharged *a common liability or burden* to recover of another, *who is also liable*, the portion he or she ought to pay or bear."  14 Tex. Jur. 3d Contribution § 1 (2006) (emphasis added).  Here, Mikron and the Sandwith Children did not share a common liability to Heritage – Mikron was never liable on the Agreements, and the Sandwith Children are not liable on the Note.[45]  Mikron did not pay more than its share on the Note to Heritage – it was liable for the full amount of the Note as co-maker, and jointly liable only with Ron Sandwith.

For these reasons, Mikron's Motion must be denied.  The Note is not an impermissible amendment of the Children's Agreements without the Sandwith's Children's consent.  Ron Sandwith had the ability to liquidate the Utilization Fee due to Heritage under his Agreement and he did so by signing the Note.  Mikron, as a co-maker of the Note, cannot challenge the enforceability of the Note on this basis.  And, the fact that the Sandwith Children can defend any subsequent attempt by Mikron to collect from them a portion of the Utilization Fee once the Note is paid (assuming that the Note is otherwise free from defenses) assures the Sandwith Children that they are not adversely

---

[45] In addition, the Court continues to attach significance to what the parties, inadvertently or otherwise, do not.  While Mikron was jointly and severally liable with Ron Sandwith as co-makers on the Note to Heritage, the Sandwith Children do not appear to have been jointly and severally liable with Ron Sandwith to Heritage under the Agreements.  Ron Sandwith's Agreement provides that he was *severally* liable to Heritage.  The Children's Agreements provide that the Sandwith Children were *jointly and* severally liable to Heritage.  Thus, there does not even appear to be any basis to argue that because Mikron was jointly and severally liable on the Note with Ron Sandwith, and Ron Sandwith was jointly and severally liable with his children (because he was not jointly and severally liable), that Mikron shared, in effect, a common liability with the Sandwith Children to Heritage.  *See also* Tex. Bus. & Com. Code Ann. § 3.116 (Vernon 1998 & Supp. 2006) (a party having joint and several liability is entitled to receive contribution from "*any party having the same joint and several liability*").

affected, individually, by their father's decision to sign the Note, and to cause Mikron to sign it as a co-maker.

### C.    Trustee's Motion

In his complaint, the Trustee asserts a breach of contract claim against Mikron by virtue of Mikron's failure to pay the Note upon its maturity.  As a co-maker of the Note, Mikron is jointly and severally liable for all amounts owing under the Note.  *See* Tex. Bus. & Com. Code § 3.116(a) (West 2002) ("Except as otherwise provided in the instrument, two or more persons who have the same liability on an instrument as makers … are jointly and severally liable in [such] capacity….").

The elements of a breach of contract claim are: (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) damages to the plaintiff resulting from the breach. *Frazin v. Hanley*, 130 S.W.3d 373, 376 (Tex. App. – Dallas 2004); *Dorsett v. Cross*, 106 S.W.3d 213, 217 (Tex. App. – Houston [1st Dist.] 2003).  "A promissory note is nothing more than a contract evincing an obligation to pay money."  *Dorsett*, 106 S.W.3d at 217 (citing *Amarillo Nat'l Bank v. Dilday*, 693 S.W.2d 38, 41 (Tex. App. – Amarillo 1985)). Breach of such an agreement "arises when a demand for payment has been made and refused."  *Dorsett*, 106 S.W.3d at 217 (citing *Intermedics, Inc. v. Grady*, 683 S.W.2d 842, 845 (Tex. App. – Houston [1st Dist.] 1984).  Accordingly, "[t]o prevail on a motion for summary judgment to enforce a promissory note, a plaintiff must establish that: (1) a note exists, (2) the plaintiff is the legal owner and holder of the note, (3) the defendant is the maker of the note, and (4) a certain balance remains due and owing on the note."  *Suttles v. Thomas Bearden Co.*, 152 S.W.3d 607, 611 (Tex. App. – Houston [1st Dist.] 2004); *see*

*also Blankenship v. Robins*, 899 S.W.2d 236, 238 (Tex. App. – Houston [14th Dist.] 1994) (same).

Each of these elements has been established here. In its answer, Mikron: (1) acknowledges the existence of the Note, (2) does not dispute the Trustee's status as the holder of the Note (on behalf of the estate), (3) admits that it executed the Note as a maker, and (4) admits that there have been no payments made under the terms of the Note since its maturity. Therefore, the Trustee has met his burden for obtaining summary judgment on the Note, unless Mikron has raised a genuine issue of material fact with respect to one or more of its defenses to its obligation to pay the Note.

Accordingly, the Court must analyze the remaining defenses to payment of the Note asserted by Mikron, to which we now turn. As to such affirmative defenses, Mikron has the burden of proof at trial, and must therefore raise a genuine issue of material, disputed fact as to each element of its defense(s) in order to prevent the entry of a summary judgment against it. *Doncaster v. Hernaiz*, 161 S.W.3d 594, 603 (Tex. App. – San Antonio 2005) (citing *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 774 (Tex. 1995)). In other words, Mikron must raise a genuine issue of material fact with respect to at least one of its defenses in order to prevent the granting of the Trustee's Motion.

### D. Mikron's Defenses to Payment of the Note

#### 1. The "Stand By"/Special Purpose Note Defense

First, Mikron asserts that the Note was intended to serve as a "stand by" or "special purpose" note, subject to adjustment thereafter once the allegedly "estimated" Utilization Fee payable under the Agreements had been fixed in amount. The Court concludes, for the reasons set forth below, that: (i) the Note is unambiguous; (ii) parol

evidence is thus inadmissible to vary its terms; (iii) Mikron has failed to raise a genuine issue of material fact with respect to the existence of a condition precedent which goes to the enforceability of the Note and not its payment terms; and (iv) Mikron has failed to raise a genuine issue of material fact with respect to its assertion that the parties agreed, after the execution of the Note, to reduce the Note amount.

In support of its "Stand By"/Special Purpose Note defense, Mikron offers certain testimony of the Sandwith Children to the effect that the Note was subject to adjustment based upon an appraisal process contemplated in the Agreements.[46]   However, such evidence is inadmissible here.  As explained by the Texas Supreme Court in *Town North National Bank v. Broaddus*, "a negotiable instrument which is clear and express in its terms cannot be varied by parol agreements or representations of a payee that a maker or surety will not be liable thereon."  569 S.W.2d 489, 491 (Tex. 1978); *see also Caraway v. Land Design Studio*, 47 S.W.3d 696, 698 (Tex. App. – Austin 2001) ("Generally, parol evidence is inadmissible to vary the terms of a promissory note").

Although Mikron contends that the Note is ambiguous, and thus parol evidence is admissible, the Court disagrees.  According to Mikron, the phrase "initial note amount" in the Note renders the Note patently ambiguous, thereby allowing the introduction of parol evidence to explain the parties' intent.  Specifically, Mikron contends that "[t]his opening phrase of the Note invites the question as to the conditions under which this 'initial' amount may change.  The Note, however, is silent about these conditions."

---

[46] Mikron also points to the testimony of various Heritage employees who testified about the appraisal process and the determination of the fee due to Heritage in client transactions – both generally and with regard to the Sandwiths specifically.  *See* Mikron's Corrected Mem. of Law in Opp. to Trustee's Mot. for Summ. J. (Docket No. 41), pp. 3-4.  However, this testimony relates to how the fee was to be calculated under the Agreements and does not raise a genuine issue of material fact with respect to the amount due under the Note.  As already found, Ron Sandwith agreed to liquidate the Utilization Fee due under his Agreement with Heritage by signing the Note and by causing Mikron to sign the Note as a co-maker.  *See supra* at pp. 15-18.

Mikron's Corrected Mem. of Law in Opp. to Trustee's Mot. for Summ. J. (Docket No. 41), p. 9.

While the phrase "initial note amount" may be somewhat unusual, recognizing the more common phraseology of "original principal amount" typically used in promissory notes, the Court cannot find the Note ambiguous solely because of the inclusion of this phrase in the Note. The similar phrase "original principal amount" is frequently used in a promissory note, and it arguably raises the same question Mikron poses here. The term "Note Amount" is defined in the Note to mean "the amount of the unpaid balance of the Principal Sum of this Note, together with all accrued but unpaid interest, and all other amounts payable under this Note.[47] The Note also permits prepayments of the unpaid balance of the principal sum of the Note at any time, as long as any prepayments are in $100,000.00 increments.[48] The phrase "Initial Note Amount" is simply a recognition that the amount of the unpaid principal of the Note (the "Note Amount") could change if any prepayments were made.

Ambiguity is a question of law for the Court to decide. *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). In determining whether an instrument is ambiguous, the Court is to "give terms their plain, ordinary, and generally accepted meaning unless the *instrument* shows that the parties used them in a different or technical sense." *Heritage Resources, Inc. v. Nationsbank*, 939 S.W.2d 118, 121 (Tex. 1996) (emphasis added). In other words, the parties' views about the meaning of the instrument are not relevant to the Court's analysis – the question is whether the instrument itself can be given a certain or definite legal meaning or interpretation by the Court. *National Union Fire Ins. Co. v.*

---

[47] T. App., Exh. F, ¶ 12.3 (App. 106).
[48] *Id*. at ¶ 3 (App. 104).

*CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) ("If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous. Parol evidence is not admissible for the purpose of creating an ambiguity") (citations omitted); *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 465 (Tex. 1998) ("An ambiguity does not arise . . . merely because the parties advance conflicting contract interpretations"); *Coker*, 650 S.W.2d at 393 ("If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law").

Where an instrument can be given a definite or certain meaning, as is the case with the Note, a court must enforce the instrument as written. *Cumbre Dev. Corp. v. Kistenmacher Eng. Co.*, 342 B.R. 746, 751 (W.D. Tex. 2006) ("If a contract can be given a definite or certain meaning, it is unambiguous and must be enforced as written") (citing *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)); *Heritage Resources*, 939 S.W.2d at 121 ("This Court [Texas Supreme Court] will enforce the unambiguous document as written"). Accordingly, any and all extrinsic evidence offered by Mikron to contradict the terms of the Note must be disregarded.

Next, Mikron attempts to carve around the parol evidence rule by focusing on the "special purpose" doctrine. To establish that a note was issued for a "special purpose," a party must prove two things: (1) that the note was conditionally delivered, and (2) that the condition or purpose goes to the enforceability of the note itself (*i.e.*, a condition precedent), and not to the note's terms of payment. *Akin v. Dahl*, 661 S.W.2d 914, 916 (Tex. 1983). In a real estate closing, for example, it is common for the underlying transactional documents to be executed at different times by the parties and delivered to

the title company. In such a case, the purchaser's promissory note, even if unconditional in its language, is obviously delivered to the title company on the express condition that it not be released to the seller/lender unless and until the title company also receives the seller's transfer of title documentation.

Here, however, there is no unfulfilled condition precedent. As admitted by Mikron, Heritage presented the Strategies to the Sandwiths, and the Sandwiths utilized them.[49] What Mikron really seeks to do is to offer evidence that the amount of the Note was subject to adjustment after the fact.[50] Such evidence would clearly vary the terms of the Note itself, which is impermissible. *Akin*, 661 S.W.2d at 916 (distinguishing the "special purpose" doctrine by explaining that "extrinsic evidence may not show a condition which adds to, subtracts from, or varies the terms of the note"). As explained by a Texas court:

> A condition precedent is one that postpones the effective date of the instrument until the happening of a contingency. In contrast, a condition subsequent is one that excuses an already binding agreement. While parol evidence is admissible to prove the existence of a condition precedent to a contract, extrinsic evidence of a condition subsequent is not admissible to vary the terms of a valid and binding written agreement.

*Litton v. Hanley*, 823 S.W.2d 428, 430-31 (Tex. App. – Houston [1st Dist.] 1992) (holding that evidence of an alleged oral agreement that the note would only be due if the business subsequently turned a profit was inadmissible).

Here, the Note is clear and unambiguous in its terms, containing no contingencies or terms for adjustment of the principal amount of the Note in the future. Accordingly, any parol evidence Mikron seeks to introduce is barred and this defense fails.

---

[49] *See* T. App., Exh. B, ¶¶ 11, 14 (App. 15-16).
[50] *See* T. App., Exh. B, ¶ 2 (affirmative defenses) (App. 17) ("The Note was a stand-by note intended only to secure the payment of an estimated fee under the Agreements … between Heritage and Sandwith and others. No fee was due under the Agreements and the Note is null and void").

Next, Mikron contends that the Note was orally amended after its execution.

According to Mikron,

> [a]t the time Gary Kornman presented the Note to Ron Sandwith and Mikron to sign, he affirmatively stated that it was a "stand-by" Note and that the appraisal would determine the final fee and the final Note amount, if any, consistent with the parties' prior Agreements.[51]   According to Heritage witnesses, Gary Kornman also continued to agree with the Sandwiths, after executing the Note, that the parties would adjust the Note depending upon the results of the appraisal.  Specifically, Gary Kornman agreed that if the appraisal came back higher than the "initial determination" of Value, there would be an equitable adjustment to the terms of the Note.

Mikron's Corrected Mem. of Law in Opp. to Trustee's Mot. for Summ. J. (Docket No. 41), p. 4 (record citations omitted).

However, the summary judgment record does not support the existence of a subsequent agreement between Gary Kornman, on behalf of Heritage, and Ron Sandwith

---

[51] Of course, Heritage, through the testimony of certain of its former employees, denies that Gary Kornman made this alleged statement to any of the Sandwiths.  The existence of this factual dispute does not raise a genuine issue of material fact, however, for one of two reasons.  First, if Mikron signed the Note as an accommodation party as it contends, then the alleged statement by Gary Kornman is inadmissible parol evidence.  Section 16 of the Note provides that "this Note may not be changed orally but only by an agreement in writing, signed by the Party against whom enforcement of any waiver, change, modification or discharge is sought. T. App, Exh. F, ¶ 16 (App. 107).  This provision precludes the introduction of such testimony by any of the Sandwith Children.  While it is true that Texas law allows parties to orally amend written contracts even where the contract prohibits oral amendments, Texas law does not permit evidence of an oral modification of an agreement which is subject to the statute of frauds.  *American Garment Properties, Inc. v. CB Richard Ellis – El Paso, L.L.C.*, 155 S.W.3d 431 (Tex. App. – El Paso 2004). Therefore, if Mikron signed the Note as an accommodation party, its signature was a "promise by one person to answer for the debt of . . . another person" within the meaning of Texas's version of the Statute of Frauds and an oral amendment would be unenforceable.  Tex. Bus. & Com. Code Ann. § 26.01(b)(2). *Carter v. Allstate Ins. Co.*, 962 S.W.2d 268 (Tex. App. – Houston [1st Dist.] 1998) (a promise to pay the debt of a third party is required to be in writing under Texas's version of the Statute of Frauds); *FDIC v. F&A Equip. Leasing*, 854 S.W.2d 681 (Tex. App. – Dallas 1993) (a surety is also known as an accommodation party under the UCC.  The Court notes that "not every oral modification to a contract within the Statute of Frauds is barred."  *American Garment*, 155 S.W.3d at 437.  However, an oral modification is barred where the modification "would materially alter the parties' written agreement."  *Id*. (quoting *Group Hosp. Svc., Inc. v. One and Two Brookriver Ctr*, 704 S.W.2d 886, 890 (Tex. App. – Dallas 1986)).  Mikron claims that the oral modification would alter the principal amount of the Note.  That modification would be material as a matter of law.

Alternatively, if Mikron did not sign the Note as an accommodation party, and therefore the Note does not fall within the statute of frauds and may be orally amended, Mikron has failed to raise a genuine issue of material fact with respect to its assertion that Heritage agreed *after* execution of the Note to reduce its amount.

and Mikron, on their own behalf, to reduce the amount of the Note if the appraisal came back lower than the "initial determination" of value, which is what Mikron, through the testimony of the Sandwith Children, now contends happened here.  First, while Mikron contends that Kornman, Ron Sandwith and Mikron agreed orally after the execution of the Note that the appraisal would still determine the fee amount, the evidence cited by Mikron fails to identify a timeframe for the alleged conversation.  Moreover, while the summary judgment evidence does raise a genuine issue of material fact about what might have happened if the appraisal process resulted in a *higher* determination of value than the value implicitly agreed upon by Ron Sandwith and Mikron when the fee was liquidated in the Note, there is no evidence that supports a finding that Gary Kornman and/or Heritage agreed, after the Note's execution, to *reduce* the amount due under the Note in the event the appraisal process came back with a lower determination of value than that agreed upon in the Note, which is the substance of the "oral agreement" Mikron now seeks to enforce.[52]

As Mikron notes in another context, to form a valid subsequent oral agreement binding upon Heritage, Mikron must prove that there was (1) a meeting of the minds between Heritage on the one hand and Ron Sandwith and Mikron on the other hand to

---

[52] Specifically, Mikron points to deposition testimony by Michael Kornman that the parties agreed to a $200 million valuation and "if the valuation came out higher, which was the concern of the Sandwith family, that we would work that out in the future.  We would take care of it in [an] equitable fashion." Mikron App., Exh. C-1 (App. 158).  Mikron also points to Michael Kornman's deposition testimony stating that the parties agreed that there would be a $200 million valuation placed on the company, and "that if the appraisals came out higher then we would do our best to work with the Sandwith family because they were worried about being able to both pay our fee and operate their business." *Id*. at App. 167.  Lastly, Mikron relies upon the deposition testimony of a Heritage employee who stated that Jeff Sandwith asked "at one point" about "what happened, you know, if the value of the company didn't come back at 200 million, whether it came back at 190 million or 210 million, you know, what happens? Do they get a refund, do they owe more money? I think Gary's response to them was not to worry about it, that, you know, something equitable would be worked out."  *Id*. at Exh. C-4 (App. 205–206).  However, none of this evidence identifies any time frame for these conversations, and the Court therefore concludes that Mikron has failed to raise a genuine issue of fact with respect to its assertion of a *subsequent* oral amendment.

reduce the amount due under the Note if the appraisal process came back with a lower determination of value than that agreed upon in the Note, and (2) consideration to support such a subsequent oral agreement. *See supra* at p. 17. Mikron has failed to raise a genuine issue of material fact supporting a finding that Kornman and/or Heritage agreed to reduce the amount due under the Note in such a circumstance. Accordingly, Mikron's subsequent oral amendment defense fails.

### 2. Unlicensed Practice of Law/Unethical Attorney Fee Defense

Mikron asserts that "Gary Kornman and Heritage were engaged in the unauthorized practice of law in Texas and Washington, and the Court should impose fee forfeiture as the remedy." Mikron's Memorandum of Law in Opposition to Trustee's Motion for Summary Judgment, p. 11. Alternatively, Mikron argues that "[e]ven if the authorized practice, the Note represents an unethical attorney fee and the Court should refuse to enforce it." *Id*.

After considering these arguments and the summary judgment record, the Court concludes, for the reasons set forth below, that (i) Mikron has raised a genuine issue of material fact with respect to whether or not Heritage was providing legal services; (ii) Mikron, if Heritage was engaged in the unauthorized practice of law, would have standing in its own right to assert this defense as the party obligated to pay for those services through the Note; (iii) the waiver of defenses contained in the Note does not preclude the Court from considering whether Heritage was engaged in the unauthorized practice of law; and (iv) since there is a disputed issue of material fact with respect to whether Heritage was providing legal services, there are disputed material issues of fact with respect to whether fee forfeiture is an appropriate remedy and/or whether the fee is

unconscionable.  Therefore, Mikron has sufficiently raised a genuine issue of material fact with respect to its "unauthorized practice of law" defense to defeat the Trustee's Motion.

The Trustee points out, and Mikron concedes, that Mikron was not Heritage's client and received no benefit from Heritage's estate and wealth planning services.  *See* Mikron's Corrected Mem. of Law in Opp. To Trustee's Mot. For Summ. J. (Docket No. 41), p. 17 (Mikron "was not a client of Heritage. It did not sign an Agreement with Heritage and did not benefit from the estate planning services").  The Trustee therefore argues that Mikron lacks standing to assert the unauthorized practice of law/unethical attorney fee defense.  In other words, the Trustee argues that even if Heritage (or Gary Kornman, Heritage's principal) was practicing law in Texas and Washington without a license, Mikron, as a non-client of Heritage and/or Kornman, cannot raises these issues in defense of enforcement of the Note since Mikron was not Heritage's client.

The Court disagrees for the following reasons.  Initially, none of the cases cited by the Trustee are applicable – each stands for the proposition that a non-client cannot sue an attorney for malpractice, or breach of fiduciary duty or the like – either because the lawyer owes no duty to non-clients or because there is no privity between the lawyer and the non-client.  *See, e.g. Bossin v. Towber*, 894 S.W.2d 25 (Tex. App. – Houston [14[th] Dist.] 1994) (attorney owes duty only to those parties in privity of contract; non-client can have no claim for negligence against attorney).  These cases are factually distinguishable.  First, Mikron is not seeking any affirmative relief against the Trustee; it is not seeking to recover damages for legal services rendered to others.  Rather, Mikron is defending against its obligation to pay the Note.  Second, there is privity of contract

between Heritage and Mikron – *i.e.*, the Note. Although Mikron was not Heritage's client, it is contractually obligated to pay a portion of the Utilization Fee. To the extent that the Utilization Fee represents the payment of legal services, then the Trustee's suit to enforce the Note is, in essence, an attempt to collect legal fees. Heritage's acceptance of the Note from Mikron contractually obligated Mikron to pay the remaining fee, and the Court does not believe that the Trustee, standing in Heritage's shoes, may now claim that Mikron lacks privity, and therefore lacks standing to defend against the payment of the remaining fee.

Courts will not aid in the enforcement of a contract made for the illegal practice of law. *Johnson v. McLeaish*, No. 05-94-01673-CV, 1995 WL 500308 (Tex. App. – Dallas Aug. 23, 2995); *Montgomery v. Utilities Ins. Co.*, 117 S.W.2d 486 (Tex. Civ. App. 1938), *rev'd on other grounds*, 138 S.W.2d 1062 (1940). A person who is not licensed to practice law may not recover for services performed. *Robnett v. Kirklin Law Firm*, 178 S.W.3d 45 (Tex. App. – Houston [1st Dist.] 2005) (attorney not entitled to recover fees under contingency-fee contract signed with clients while attorney was suspended from practice); *Johnson*, 1995 WL 500308 at *8; *Hughes v. Ft. Worth Nat'l Bank*, 164 S.W.2d 231 (Tex. Civ. App. 1942). Since Heritage could not collect a fee from its own client if it was engaged in the unauthorized practice of law, the Court concludes that it should not be able to collect that fee from a non-client either, whom it has made contractually liable for payment by accepting a note for the payment of the fee. Thus, whether or not Mikron has standing to raise its unauthorized practice of law defense therefore depends upon whether or not Heritage was "practicing law," such that the Note represents the payment of legal services.

Texas defines the practice of law, as relevant here, as "a service rendered out of court, including the giving of advice or the rendering of any service requiring the use of legal skill or knowledge, such as preparing a will, contract, or other instrument, the legal effect of which under the facts and conclusions involved must be carefully determined." Tex. Gov't Code Ann. § 81.101 (Vernon 2005). However, this definition is "not exclusive and does not deprive the judicial branch of the power and authority under both this chapter and the adjudicated cases to determine whether other services and acts not enumerated may constitute the practice of law." *Id*.; *Crain v. Unauthorized Practice of Law Comm. Of Sup. Ct. of Texas*, 11 S.W.3d 328 (Tex. App. – Houston [1st Dist.] 1999) (courts inherently have the power to determine whether services may constitute the practice of law); *Brown v. Unauthorized Practice of Law Comm.*, 742 S.W. 2d 34 (Tex. App. – Dallas 1987) (courts have authority to determine what constitutes the practice of law on a case-by-case basis, unrestrained by any statutory definition). The practice of law embraces all advice to clients and all action taken for them in matters connected with the law. *In re Guttierez*, 248 B.R. 287 (Bankr. W.D. Tex. 2000 (applying Texas law)). Moreover, the selling of legal advice has been held to constitute the practice of law. *Fadia v. Unauthorized Practice of Law Comm.*, 830 S.W.2d 162 (Tex. App. – Dallas 1992).

Here, the Court concludes that Mikron has provided evidence sufficient to raise a genuine issue of material fact with respect to whether or not Heritage was providing legal advice and engaging in the practice of law. Mikron has submitted evidence that Heritage and Kornman provided the Sandwiths with a presentation containing information about the rule against perpetuities, avoiding will contests, the "prudent person rule," the effect

of statutes of limitations, the transfer of assets on a basis other than "per stirpes," and that a particular act would not be considered a "gift under the '*Frazee*' case."[53]  There is also evidence, in the form of a declaration by Jeffrey Sandwith, that Heritage gave the Sandwiths copies of cases, informed them that the trusts Heritage proposed would protect their assets from judgment creditors, and that the Strategies were "legal and enforceable."[54]  Mikron has also submitted an affidavit of a retained expert that opines that Heritage was providing legal services and was engaged in the unauthorized practice of law.[55]

In contrast, the Trustee submitted evidence that the Sandwiths retained Michael Mulligan of the Lewis, Rice Fingerish law firm (the "LRF Firm") to represent them, and that the LRF Firm prepared all of the legal documents necessary to implement the Strategies, and provided a lengthy legal opinion as to their legality.  While the Trustee provided evidence to refute some of Mikron's expert's opinion, the Court believes that, when the evidence is viewed in the light most favorable to Mikron, Mikron has raised a genuine issue of material fact with respect to Heritage/Kornman's alleged unauthorized practice of law.[56]  And, while Mikron, as a non-client, may not be able to recover affirmatively from Heritage and/or Kornman for malpractice or breaches of duty, if Heritage engaged in the unauthorized practice of law, Mikron is able to assert that issue defensively to avoid payment of the resulting legal fees.[57]

---

[53] *See, e.g.,* Mikron App., Exh. 3 (App. 54, 63, 67, 81).

[54] Mikron App., Exh. A, ¶¶ 13, 16, 17 (App. 9-10).

[55] Mikron App., Exh. B, ¶¶ 5, 6-18 (App. 129-33).

[56] The Court notes that both of the parties and Mikron's retained expert all blur the distinction between Heritage and Kornman with respect to the unauthorized practice of law defense.  The Court will treat them together for this purpose as the parties have.

[57] For the same reason, the Court rejects the Trustee's argument that Mikron may not raise the alleged "unauthorized practice" and fee forfeiture issues because there is no private right of action under the Texas Disciplinary Rules of Professional Conduct and the Texas statutes regulating the practice of law.  Mikron is

While Mikron may have standing to assert this defense, and has raised a genuine issue of material fact regarding the nature of Heritage's services and whether those services might be found to constitute the unauthorized practice of law, the Trustee argues that Mikron waived this defense[58] by acknowledging in the Note that the Note was "good, valid, and in all respects free from all defenses."[59]  *See Beal Bank, S.S.B. v. Schleider*, 124 S.W.3d 640, 654 (Tex. App. – Houston [14th Dist.] 2003) (waiver is "an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right") (quoting *Cont'l Casting Corp. v. Siderca Corp.*, 38 S.W.3d 782, 789 (Tex. App. – Houston [14th Dist.] 2001)).

The Court begins its analysis by determining whether the Note contains a waiver. Whether a waiver exists is a question of fact, except in circumstances where waiver is

---

not seeking an affirmative recovery here; it is merely defending against enforcement of the Note.  In other words, Mikron can assert the alleged "unauthorized practice" defense against the alleged lawyer because it is the entity contractually obligated to pay the fee by virtue of having signed the Note, notwithstanding the fact that Mikron did not sign the Agreements (which provided initially for the rendition of services and payment of the fee).  In a similar vein, the Court also rejects the Trustee's argument that Mikron is prevented from claiming that Heritage was engaged in the unauthorized practice of law by virtue of the contractual disclaimer contained in the Agreements.  Mikron did not sign the Agreements, and is therefore not bound by their terms.

[58] The Trustee also argues that each of the Agreements contains a contractual disclaimer which prevents Mikron from raising this defense. By way of further explanation, while Heritage provided the Strategies to the Sandwiths, it left it up to the Sandwiths, upon the advice of their admitted legal advisors, to determine whether or not to implement any of them.  Ron Sandwith and each of the Sandwith Children (i) acknowledged in their respective service agreements that Heritage was not providing legal services and (ii) agreed to consult with his own advisors before using the Strategies. *See* T. App., Exh. C, art. 5.2 (App. 23); T. App., Exh. D, art. 5.2 (App. 38, 54, 70, 86).  Similarly, the Strategies presented to the Sandwiths contained a statement that "No attempt has been made by The Heritage Organization, L.L.C. . . . to give legal advice and/or accounting advice regarding the federal or state tax treatment of this or any other plan. Please seek the counsel of your own legal advisor . . . ." Mikron App., Exh. A-3 (App. 37).  In fact, Mikron admits that the Sandwiths retained the LRF Firm to prepare the necessary legal documents and provide a legal opinion on the Strategies.  *See* T. App., Exh. A, ¶ 15 (App. 4); T. App., Exh. B, ¶ 15 (App. 16). However, as Mikron was not a party to the Agreements, it is not bound by these disclaimers**.**

The Court expresses no view here on the merits of the Trustee's assertion that a contractual disclaimer could bar *the other party to the contract* from raising this defense.  Moreover, the existence of the disclaimer, coupled with the sophistication and experience of the party executing the disclaimer (which acknowledges that Heritage was not engaged in the practice of law) and the presence of "outside" counsel, are facts which will be relevant to the Court's determination of the merits of the unauthorized practice of law defense.

[59]*See* T. App., Exh. F, ¶¶ 14, 19 (App. 107).

clearly established by the evidence. *Bott v. J.F. Shea Co.*, 388 F.3d 530, 533-534 (5th Cir. 2004) (citing *Tenneco Inc. v. Enter. Prod. Co.*, 925 S.W.2d 640, 643 (Tex.1996)). A proper analysis focuses on intent. *Ford v. Culbertson*, 308 S.W.2d 855, 865 (Tex. 1958). In order to establish the requisite intent, a court must find an unequivocal renunciation of a right through acts, words, or conduct. *Marriott Corp. v. Azar*, 697 S.W.2d 60, 65 (Tex. App.–El Paso 1985) (citations omitted). The issue of waiver becomes a matter of law where material facts and circumstances are either undisputed or are clearly established "and there is no room for argument or inference." *Bott*, 388 F.3d at 534 (finding waiver as a matter of law and quoting *First Interstate Bank of Arizona, N.A. v. Interfund Corp.*, 924 F.2d 588, 595 (5th Cir. 1991)).

Under Texas law, "the elements of waiver are: (1) an existing right, benefit, or advantage; (2) knowledge, actual or constructive, of its existence; and (3) actual intent to relinquish the right, which can be inferred from conduct." *First Interstate Bank of Arizona*, 924 F.2d at 595 (5th Cir. 1991). Intent may be established by words which "manifest an unequivocal intention to no longer assert the right." *Id.*

Here, the Note contains the following clause: "[t]he Co-Makers . . . of this Note state and warrant that this Note is good, valid, and in all respects free from all defenses, both in law and in equity . . . ."[60] It cannot be disputed that Ron Sandwith, Mikron's founder and majority shareholder, had knowledge of all of the relevant facts surrounding the Agreements and the execution of the Note. It is also undisputed that Mikron was a closely-held corporation, that had funded the payment of the first portion of the Utilization Fee by declaring a dividend to Ron Sandwith and the Sandwith Children. The language of this clause in the Note clearly establishes an unequivocal renunciation of the

---

[60] T. App., Exh. F, ¶¶ 14, 19 (App. 107).

co-makers' right to raise any defenses.[61]    Therefore, the Court finds that the Note contains a valid waiver provision as a matter of law.

Next, the Court considers the enforceability of the waiver.  Under the UCC, a promissory note may contain a waiver provision unless an applicable Texas law prohibits the inclusion of such a provision.  Tex. Bus. & Com. Code Ann. § 3.104(a)(3) (Vernon 2002); State Bar Committee Comments ("Section 3.104(a)(3) permits . . . waivers of the benefit of any law intended for the protection of an obligor [but] these provisions should not be construed to supersede or revoke any provision of other Texas law that prohibits or makes ineffective any such provision in a promissory note . . .").  Here, the parties did not point to, nor has the Court's own research revealed, any applicable Texas statute prohibiting the inclusion of the waiver provision at issue here.

However, the Court concludes that the waiver contained within the Note may be unenforceable here, if Heritage is ultimately found to have engaged in the unauthorized practice of law.  As noted earlier, courts will not aid the enforcement of an illegal contract.  If Heritage in fact engaged in the unauthorized practice of law, it would be against public policy to allow Heritage to insulate itself from this defense by including a contractual waiver of the defense in the Note.  The Court believes that a Texas court would refuse to enforce a contractual waiver clause in these circumstances.[62]    Therefore,

---

[61]  In response to the Court's inquiry, the parties have stipulated that at the time the Agreements and the Note were signed, Ron Sandwith was a director of Mikron and Chairman of its Board of Directors.  E-mail from E. Lee Morris, Esq. to Law Clerk (Nov. 22, 2006 11:42 a.m. (CST)) (on file with author) and E-mail from John Bjorkman, Esq. to Law Clerk (Nov. 22, 2006 2:17 p.m. (CST)) (on file with author). As previously noted, Ron Sandwith held approximately 93% of Mikron's stock.  Jeff Sandwith, who signed the Note on behalf of Mikron as its "Co-President," had also signed a service agreement with Heritage.  In this circumstance, it is appropriate to impute the knowledge of any potential defenses of Ron Sandwith and Jeff Sandwith to Mikron.  *Hirsch v. Texas Lawyers' Ins. Exchange*, 808 S.W.2d 561 (Tex. App. – El Paso 1991).

[62]  The Court believes that a Texas court would sever the waiver clause from the parties' contract and would otherwise enforce the Note as written.  Under Texas law, if the subject matter of the contract is legal, but an

the existence of a genuine issue of disputed material fact on one of Mikron's defenses precludes entry of judgment in the Trustee's favor.

For the same reason, the Court also concludes that Mikron has raised a genuine issue of material fact on the issue of whether a proper remedy for Heritage's alleged unauthorized practice of law is a forfeiture of "the total fee the Trustee claims under the Note." Mikron's Corrected Mem. of Law in Opp. to Trustee's Mot. for Summ. J. (Docket No. 41), p. 15. There is an issue of fact with respect to whether Heritage was engaged in the unauthorized practice of law and, therefore, there are issues of fact with respect to (i) whether the Note represents the payment of legal services, and (ii) whether fee forfeiture is an appropriate remedy.

Finally, Mikron argues that Heritage had a duty to refrain from charging an unconscionable fee, and violated that duty when it charged a fee in excess of $11 million here. First, the Court notes that the standards which Mikron asserts govern Heritage's fee apply only to fees for legal services. As noted earlier, to the extent that the Note represents the payment of a legal fee, Mikron, as the party obligated to pay the Note, has standing to assert that the Note is unenforceable because it represents an unconscionable legal fee. And, Mikron has successfully raised an issue of fact with respect to whether Heritage/Kornman was engaged in the unauthorized practice of law, and thus whether the Note (or some portion of it) represents the payment of a fee for legal services. The Court is thus unable, at the summary judgment phase, to determine whether or not the

---

incidental promise contained within the contract is illegal, the illegal provision may be severable, and the court will sever an invalid provision and uphold the valid portion if the invalid provision does not constitute the essential purpose of the agreement. *In re Kasschau*, 11 S.W.3d 305 (Tex. App. – Houston [14th Dist.] 1999). In determining whether the contract is severable, courts examine the parties' intent expressed by the language in the contract. *Id*. The Note contains a clause which provides that any term held illegal or unenforceable would be severed. *See* T. App., Exh. F, ¶ 9 (App. 105).

Utilization Fee is either unreasonable or unconscionable, because the Court is unable to determine whether the Utilization Fee is subject to the standards governing the payment of legal fees in Texas.

Even assuming those standards apply, the Court notes that the basic test for unconscionability "is whether, given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract. The principle is one of preventing oppression and unfair surprise and not of disturbing allocation of risks because of superior bargaining power." *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 757 (Tex. 2001). A disparity in bargaining power, while relevant, "is not the litmus test for unconscionability. Something more must be shown. How much more is a difficult question, however, because the term unconscionable has no precise legal definition." *Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 498 (Tex. 1991) (Gonzalez, J., concurring).

Although many factors are relevant and no single formula exists, proof of a claim of unconscionability begins with two broad questions: (1) how did the parties arrive at the terms in controversy; and (2) are there legitimate commercial reasons which justify the inclusion of those terms? The first question, often described as the procedural aspect of unconscionability, is concerned with assent and focuses on the facts surrounding the bargaining process. The second question, often described as the substantive aspect of unconscionability, is concerned with the fairness of the resulting agreement. *Id*. at 498-499 (Gonzalez, concurring). Addressing the issue of unconscionability, the Texas Court of Appeals stated:

[i]n determining whether a contract is unconscionable or not, the court must look to the entire atmosphere in which the agreement was made; the alternatives, if any, which were available to the parties at the time of the making of the contract; the non-bargaining ability of one party; whether the contract is illegal or against public policy; and, whether the contract is oppressive or unreasonable. At the same time, a party who knowingly enters into a lawful but improvident contract is not entitled to protection by the courts. In the absence of any mistake, fraud, or oppression, the courts, as such, are not interested in the wisdom or imprudence of contracts and agreements voluntarily entered into between parties compos mentis and sui juris. Such parties to contracts have the right to insert any stipulations that may be agreed to, provided they are neither unconscionable nor otherwise illegal or contrary to public policy. It has accordingly been said that, almost without limitation, what the parties agree upon is valid, the parties are bound by the agreement they have made, and the fact that a bargain is a hard one does not entitle a party to be relieved therefrom if he assumed it fairly and voluntarily. A contract is not unenforceable on the ground that it yields a return disproportionate to the expenditures in time and money, where there has been no mistake or unfairness and the party against whom it is sought to be enforced has received and enjoyed the benefits.

*In re Big 8 Food Stores, Ltd*., 166 S.W.3d 869, 877-78 (Tex. App.–El Paso 2005).

An in-depth analysis is required in deciding whether or not the contractual term at issue is unconscionable. The court must look to the "totality of the circumstances" at "the time the contract was formed." *Ski River Dev., Inc. v. McCalla*, 167 S.W. 3d 121, 136 (Tex. App. – Waco 2005). In analyzing these questions,

[i]t is important to consider whether there is any gross disparity in the values exchanged. Gross inequality of bargaining power, together with terms unreasonably favorable to the stronger party may show that the weaker party had no meaningful choice, no real alternative, or did not in fact assent or appear to assent to the unfair terms. Factors that may contribute to an unconscionable bargaining process include: (1) knowledge of the stronger party that the weaker party will be unable to receive substantial benefits from the contract; and (2) knowledge of the stronger party that the weaker party is unable reasonably to protect his interests by reason of physical or mental infirmities, ignorance, illiteracy or inability to understand the language of the agreement. The grounds for substantive abuse must be sufficiently shocking or gross to compel the court to intercede, and the same is true for procedural abuse--the circumstances surrounding the negotiations must be shocking.

*Id*. The issue of "unconscionability must be determined on a case-by-case basis," *Pony Express Courier Corp. v. Morris*, 921 S.W.2d 817, 821 (Tex. App. – San Ant. 1996), and it is ultimately a question of law to be determined by the court. *Ski River Development, Inc.*, 167 S.W.3d at 136. However, "[u]nder Texas law, the party asserting unconscionability of a contract bears the burden of proving both procedural and substantive unconscionability." *Id*.

Mikron has submitted the declaration of Linda Eads, a professor of law at Southern Methodist University Dedman School of Law, who serves as Chair of the State Bar of Texas Committee on the Texas Disciplinary Rules of Professional Conduct, in which she opines that the fee is "an unethical fee because it is [an] unreasonable legal fee in both Texas and Washington."[63] The Court concludes that her declaration, which is supported by an analysis of the factors that courts consider in determining the reasonableness of attorneys' fees,[64] raises a genuine issue of fact if the Note represents the payment of a legal fee. Therefore, the Court concludes that the factual dispute about whether or not Heritage was engaged in the unauthorized practice of law precludes the entry of summary judgment in the Trustee's favor.

### 3. The Probate Defense Under RCW ch. 11.40

Mikron, claiming that it is an accommodation party under the UCC, asserts that the Trustee's claims are barred by the applicable probate claims bar date under Washington state law, specifically Chapter 11.40 of the Revised Code of Washington (the

---

[63] Mikron App., Exh. B, ¶ 5E (App. 129); ¶¶ 27-28 (App. 137-140).

[64] For example, Professor Eads analyzes the number of documents that Heritage prepared and the number of meetings it attended, and determines that the amount of work performed does not justify the fee. She also notes that the LRF firm charged a total of $250,000, and that the volume of work it did was "substantially greater" than the work Heritage did. Mikron App., Exh. B, ¶¶ 27- 28 (App. 137-140). The Trustee did not refute this evidence in the summary judgment record, and the Court concludes it is sufficient to raise a genuine issue of material fact with respect to Mikron's defense.

"Probate Code"). *See* Wash. Rev. Code § 11.40.051 (West 1998 & Supp. 2006). According to Mikron, Ron Sandwith died in May 2003 and his estate was probated in Seattle, Washington. Mikron asserts that a creditor who receives actual notice of the probate proceeding must file a claim against the probate estate within thirty days after the personal representative's mailing of the notice to the creditor. Wash. Rev. Code § 11.40.051(1)(a) (West 1998 & Supp. 2006) (the "Nonclaim Statute"). Mikron further asserts that if the creditor then fails to timely file a claim, its claim against the decedent's probate and non-probate assets are forever barred. *Id*. Mikron next asserts that (1) the Sandwiths mailed actual notice of the probate proceeding to Heritage and to an entity to which Heritage had assigned the Note at that time;[65] (2) neither Heritage nor the then holder of the Note timely filed a claim in the probate proceeding; and (3) all claims on the Note against Sandwith's estate have therefore expired. Accordingly, Mikron contends that since Heritage's claims against Ron Sandwith are legally barred, claims against it, as an accommodation party, are likewise barred.

In response, the Trustee initially argues that the Nonclaim Statute does not apply to this claim, relying on Washington authority which states that claims which arise after death do not fall within the purvue of the Nonclaim Statute and, therefore, a claim need not be filed. *See, e.g., Judson v. Associated Meats & Seafoods*, 651 P.2d 222, 224 (Wash. Ct. App. 1982) (a "claim that arose after death . . . is a claim against the estate, not the deceased. Claims against the estate . . . need not be filed in order to be allowed"). The Trustee argues, citing primarily the case of *Runkle v. Bank of California*, 614 P.2d 226 (Wash. Ct. App. 1980), that the claim against Ron Sandwith arose after death and thus a

---

[65] After the bankruptcy case was filed, the Trustee recovered the Note through the use of his avoiding powers. *See* Adv. Pro. No. 05-3028-BJH.

claim did not need to be filed under the Probate Code.  In essence, the Trustee argues that even though the contractual relationship between Heritage and Ron Sandwith arose during Ron Sandwith's lifetime, the Note did not mature until after his death, and thus the claim does not fall within the Nonclaim Statute.

In the *Runkle* case, the contractual relationship was also formed during the decedent's lifetime, and the contract at issue provided that the decedent was to make certain payments to third parties upon the decedent's receipt of certain specified funds. The decedent died before receiving the funds, and his estate received them after his death. In a suit to enforce the obligation to pay the funds over to third parties, brought after the expiration of the bar date set forth in the Nonclaim Statute, the court held that since the funds were not received until after the decedent's death, the obligation to pay the funds did not mature until after death, and the Nonclaim Statute was thus inapplicable.

In response, Mikron argues that the *Runkle* case is both contrary to the structure of the Probate Code and prior Washington Supreme Court precedent, and was thus wrongly decided. The Court agrees with Mikron.  First, the structure of the Probate Code does in fact suggest that a claim must be filed or it will be barred, even where the claim is unmatured.  Section 11.40.070 of the Probate Code, which governs the form and manner of presentation of claims, provides that the claim must include the following information: "(e) If the claim is secured, unliquidated, contingent, or *not yet due*, the nature of the security, the nature of the uncertainty, or the date when it will become due."  Wash. Rev. Code. § 11.40.070(e) (West 1998 & Supp. 2006).   Similarly, Section 11.76.180 of Chapter 11.76 of the Probate Code, entitled "Order maturing claim not due," provides that "[i]f there be any claim not due the court may in its discretion, after hearing upon

such notice as may be determined by it, mature such claim and direct that the same be paid in the due course of the administration." Wash. Rev. Code. § 11.76.180 (West 1998 & Supp. 2006).  Section 11.76.190 similarly provides that "[i]f there be any contingent or disputed claim against the estate, the amount thereof, or such part thereof as the holder would be entitled to, if the claim were established or absolute, shall be paid into the court . . . ." Wash. Rev. Code § 11.76.180 (West 1998 & Supp. 2006).  The Probate Code thus contemplates that claims will be filed against the probate estate which are contingent, unliquidated or unmatured.[66]

Moreover, cases decided by the Supreme Court of Washington, albeit under a prior (but similar) version of the Probate Code, have held that a claim which arises out of a contractual obligation incurred during the decedent's lifetime must be filed under the Nonclaim Statute.  *James v. Corvin*, 51 P.2d 689 (Wash. 1935) (claim for damages for post-death breach of lease entered into during decedent's lifetime required, as a prerequisite to suit, that the claim be filed under the operative version of the nonclaim statute); *Horton v. McCord*, 291 P. 717, 719 (Wash. 1930) (suit for damages from post-death breach of employment agreement entered into during employer/decedent's lifetime barred by failure of employee to present claim to the estate, and stating that court had "repeatedly held that [the prior nonclaim statute] is controlling touching the presentation and filing of claims of every nature, including contingent claims"); *Davis v. Shepard*, 237 P. 21, 24 (Wash. 1925) (the prior version of the nonclaim statute "applies to claims of every kind and nature, both those established and those contingent"); *see Barto v. Stewart*, 59 P. 480 (Wash. 1899).  Therefore, the Court agrees with Mikron that the

---

[66] The Court believes, therefore, that the structure of the Probate Code reflects policies similar to those reflected by Congress in enacting a broad definition of the word "claim" in the Bankruptcy Code.

*Runkle* case was wrongly decided, in light of both the structure of the Probate Code and contrary authority. The Nonclaim Statute is thus applicable to the Trustee's claim under the Note.[67]

Next, the Trustee argues that Mikron cannot assert the Nonclaim Statute as a defense for several other reasons. First, the Trustee argues that an accommodation party, assuming Mikron ultimately establishes such status as a matter of law, is given only common law contract defenses, not statutory defenses. Under Section 3.305(d) of the UCC, an accommodation party may, with certain exceptions not relevant here, assert "any defense or claim in recoupment under Subsection (a) that the accommodated party could assert . . . ." Tex. Bus. & Com. Code Ann. § 3.305(d) (Vernon 2002 & Supp. 2006). The defenses under Subsection (a) include, as relevant here, "a defense of the obligor stated in another section of this chapter or a defense of the obligor that would be available if the person entitled to enforce the instrument were enforcing a right to payment under a simple contract . . . ." Tex. Bus. & Com. Code Ann. § 3.305(a)(2) (Vernon 2002 & Supp. 2006). Therefore, the Trustee argues that Mikron may only assert the common law contract defenses of the alleged accommodated party, Ron Sandwith.

The Court disagrees. First, as Mikron points out, Section 1.103 of the UCC, entitled "Construction of Title to Promote Its Purposes and Policies; Applicability of Supplemental Principles of Law," states:

> (b) Unless displaced by the particular provisions of this title, the principles of law and equity, including the law merchant and the law relative to

---

[67] The Court also rejects the Trustee's argument that because the Washington Supreme Court denied a petition for review of *Runkle*, that *Runkle* accurately reflects the current state of the law in Washington. *See Chrobuck v. Snohomish County*, 480 P.2d 489, 505 n.4 (1971) ("No significance should be attached to this court's denial of a petition for review . . . since the decision whether or not to review a particular case derives from considerations other than our opinion of the merits") (Neill, dissenting).

> capacity to contract, principal and agent, estoppel . . . or other validating
> or invalidating cause shall supplement its provisions."

Comment 4 to Section 1.103 states that the "list of sources of supplemental law in

subsection (b) is intended to be merely illustrative of the other law that may supplement

the [UCC] and is not exclusive."    Comment 3, which specifically discusses the

application of subsection (b) to statutes, recognizes that "state law, however, increasingly

is statutory," and that when "the other law relating to a matter within the scope of the

[UCC] is a statute, the principles of subsection (b) remain relevant to the court's analysis

of the relationship between that statute and the [UCC] . . ." Comment 3 further recognizes

that

> other interpretive principles addressing the interrelationship between
> statutes may lead the court to conclude that the other statute is controlling,
> even though it conflicts with the [UCC].  This, for example, would be the
> result in a situation where the other statute was specifically intended to
> provide additional protection to a class of individuals engaging in
> transactions covered by the [UCC].

From these statements, the Court concludes that Section 3.305(a), while referring

to defenses available "on a simple contract," does not restrict available defenses to those

that are available under the common law, and instead permits the assertion of statutory

defenses where those defenses could be used to defend an action on a simple contract.

Moreover, the Court notes that the Nonclaim Statute (or a prior version of it) has been

interpreted to bar claims arising from a contract.  *James v. Corvin,* 51 P.2d 689 (Wash.

1935) (stating that a suit for damages on a lease was barred by the failure of plaintiff to

file a claim under the Nonclaim Statute).  Therefore, the Court concludes that Mikron, if

it is an accommodation party, may raise the Nonclaim Statute as a defense to the Trustee's enforcement of the Note.[68]

The Trustee also argues, however, that an accommodation party can only raise the defenses assertable by the accommodated party – allegedly Ron Sandwith, and that Ron Sandwith could not assert the Nonclaim Statute as a defense for two reasons. First, the Trustee argues that Ron Sandwith could never assert the defense as a matter of law, because the defense is only implicated upon his death. That argument certainly has some logical appeal. Second, the Trustee argues that the Nonclaim Statute defense is one which is assertable solely by the Estate of Ron Sandwith, and not by Ron Sandwith himself, because the nature of a nonclaim statute is that it creates rights *in rem* against a decedent's property, not a right against the decedent. In other words, the Trustee argues that a nonclaim statute, while containing a bar date for the filing of claims, is inherently different than a statute of limitations. The Trustee argues, citing *Bellevue Sch. Dist. No. 405 v. Brazier Constr. Co.*, 691 P.2d 178 (Wash. 1984), that a nonclaim statute actually creates *in rem* rights against an estate and then provides that those rights are assertable within a limited period of time, while a statute of limitations does not create any rights, but merely provides a time limit for the assertion of rights against a person.

The Court agrees. Describing the "unique nature of nonclaim statutes" the Washington Supreme Court stated:

---

[68] The Court also rejects the Trustee's argument that Mikron has waived this defense by virtue of the clause in the Note which states that the parties warrant that the Note is free from all defenses. While the Court holds that this clause manifests an intent by the parties to waive defenses, a waiver requires a voluntary relinquishment of a known right. On the peculiar facts of this case, the Court does not believe that the clause may be properly construed as a waiver of this defense, the existence of which could not have been known at the time the Note was executed. Moreover, only the parties to the Note waived their defenses. As set forth herein, the Court concludes that neither Mikron nor Ron Sandwith hold this defense; rather, it is held by the estate of Ron Sandwith, and thus has not been waived.

> Inherent in the nature of these nonclaim statutes is the creation of a right and an obligation to assert the right within a fixed time period or the right sought to be enforced will be barred. The 'rights' created by nonclaim provisions are statutory rights that ordinarily would not exist without the existence of the nonclaim provision . . . the policy of the probate nonclaim statute is to limit *in rem* claims against the decedent's estate, expedite the settling of estates, and facilitate the distribution of decedent's property to the heirs and devisees. This court has recognized that no good reason exists to allow the State to bring *in rem* claims against estates long after the nonclaim limitation period has expired.

*Bellevue*, at 184-185. *See also State v. Evans*, 255 P. 1035, 1036 (Wash. 1927) (a "creditor's claim against the estate of a deceased person is, in substance, a claim in rem, since it is of necessity only a claim against the property left by the deceased. It is not a personal claim against any one").

In response, Mikron argues that the Note itself contains a clause which, in effect, makes the estate of Ron Sandwith the successor to Ron Sandwith, and thus Mikron can assert not only Ron Sandwith's defenses, but those available to his estate. The logic of Mikron's argument starts with the Note itself – *i.e.*, the Note provides that it shall "apply to, inure to be benefit of, and bind all Parties hereto, their heirs . . . administrators, executors . . . and assigns." Mikron argues that "if the Note is valid and enforceable, the estate of Ron Sandwith and his personal representative succeeded to its terms, and to his rights and obligations." Mikron Supp. Summ. J. Brief (Docket No. 45), p. 6. Mikron therefore argues that since Ron Sandwith's estate succeeded to his Note obligations, Mikron can assert the defenses of Ron Sandwith's estate.

Mikron's interpretation of the Note is strained, at best. The only obligation Ron Sandwith had under the Note was to pay it. And, his estate succeeded to that obligation

under the express terms of the Note.  The Note suggests that Ron Sandwith's estate steps into Ron Sandwith's shoes, not that Mikron steps into the shoes of Ron Sandwith's estate.

Mikron also argues that the UCC defines its terms in such a manner as to permit Mikron to assert defenses available to the estate of Ron Sandwith.  Specifically, Mikron asserts that under Section 3.305(d), an accommodation party can assert the defenses of the accommodated party, and the Court thus far agrees.  Mikron also argues that the accommodated party can assert the defenses of an "obligor," by the express terms of Section 3.305(a).  Once again, thus far, the Court agrees.  Mikron then points out that UCC Section 3.103(a)(11) defines a "principal obligor" as "the accommodated party or any other party to the instrument against whom a secondary obligor has recourse under this chapter."  Mikron therefore argues that

> [t]he Note itself makes the Estate of Ron Sandwith the successor to Ron Sandwith and thus an "obligor,"  that is, "any other party to the instrument against whom a secondary obligor [Mikron] has recourse under this chapter." Consequently, in the event that the Note were deemed valid, the estate would be the obligor and Mikron, as the party accommodating the estate, is fully entitled to assert defenses available to the principal obligor.

Here, the Court and Mikron part company, as the Court concludes that Mikron's argument stretches the UCC farther than it can go.  First, under no circumstances is the estate of Ron Sandwith a "party to the instrument."  Second, Section 3.103(a) of the UCC, by defining a "principal obligor" in the disjunctive, clearly references the "accommodated party" and "any other party" as two separate entities.  One who succeeds to the rights/obligations of the accommodated party (*i.e.*, the estate of Ron Sandwith) steps into the shoes of the accommodated party, but there is no textual basis for the conclusion that he thereby becomes "any other party to the instrument against whom a

secondary obligor has recourse."  Nor has Mikron provided the Court with any authority supporting its strained reading.

As noted earlier, there is a genuine issue of disputed fact with respect to whether or not Mikron is an accommodation party.  However, the Court concludes that the factual dispute is not material with respect to this defense.  Even if Mikron is an accommodation party, the Court concludes, for the reasons set forth above, that Mikron may not, as a matter of law, assert the Nonclaim Statute as a defense to enforcement of the Note because that defense is not available to the accommodated party, but is only available to the estate of Ron Sandwith.[69]

### 4.  Defenses Pled, But Not Relied Upon in Opposition to the Trustee's Motion.

Mikron pled various additional defenses in its answer to the Trustee's complaint. However, Mikron did not argue these additional defenses in response to the Trustee's Motion, and made no effort to come forward with competent summary judgment evidence establishing the existence of a genuine fact issue.  "Rule 56 does not impose a duty on the court to 'sift through the record in search of evidence' to support the nonmovant's opposition to the motion for summary judgment."  *Lindley v. Hackard & Holt*, No. 3:05-CV-1476, 2006 WL 2135825 (N.D. Tx. July 31, 2006) (slip opinion) (quoting *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)). Rather, if the nonmoving party "fails to make a showing sufficient to establish the

---

[69] If the Court has erred in its conclusion that Mikron may not assert the Nonclaim Statute defense because that defense is not available to Ron Sandwith, who was the accommodated party, the Court finds that Mikron has raised a genuine issue of material fact with respect to the merits of the defense.  Mikron's summary judgment evidence raises a genuine issue of fact because (i) Mikron has provided evidence that it complied with the notice requirements of Wash. Rev. Code 11.40.020, (ii) the Court holds that the claim arose prior to Ron Sandwith's death and thus the Nonclaim Statute applies, and (iii) it is undisputed that neither Heritage nor US Recovery timely filed a claim in the probate proceeding.  Therefore, if Mikron is an accommodation party and if it is entitled to assert the defenses of the estate of Ron Sandwith, summary judment in the Trustee's favor would be inappropriate.

existence of an essential element to its case and on which it will bear the burden of proof at trial, summary judgment must be granted." *Id*. Accordingly, the Court concludes that these additional defenses do not preclude the granting of the Trustee's Motion.

## III. CONCLUSION

Mikron's Motion must be denied. The Note is not an impermissible amendment of the Children's Agreements without their consent. Ron Sandwith had the ability to liquidate the Utilization Fee due to Heritage under his Agreement and he did so by signing the Note. Mikron, as a co-maker of the Note, cannot challenge the enforceability of the Note on this basis. And, the fact that (i) Mikron has no right of contribution from the Sandwith Children, and/or (ii) the Sandwith Children can defend any subsequent attempt by Mikron to collect from them a portion of the Utilization Fee once the Note is paid assures the Sandwith Children that they are not adversely affected, individually, by their father's decision to sign the Note, and to cause Mikron to sign it as a co-maker.

Conversely, the Trustee has established each of the elements of his breach of contract claim against Mikron. While Mikron asserted numerous defenses to the Trustee's enforcement of the Note, Mikron established a genuine issue of material fact with respect to only one of its defenses. Accordingly, the Trustee's Motion must be denied and the Court will proceed to trial on the issues surrounding Mikron's unauthorized practice of law defense. Specifically, the Court will proceed to trial on the following issues: (i) was Heritage engaged in the unauthorized practice of law, (ii) if so, is a total fee forfeiture the appropriate remedy, and/or (iii) if so, is the fee charged for those unauthorized legal services unconscionable?

**SO ORDERED**.

### End of Memorandum Opinion and Order ###